SHAW, Judge.
James Duke Heflin was eonvicted of driving under the influence of alcohol, a violation of § 32-5A-191, Ala.Code 1975. He was sentenced to one year’s imprisonment; the sentence was suspended, and he was placed on unsupervised probation.
The evidence adduced at trial indicated the following. On the night of October 30, 1997, while on patrol, Montgomery County Sheriffs Deputy Theresa Donohoo observed a vehicle being driven by the appellant Heflin weaving in and out of traffic, passing other vehicles in an unsafe manner, and speeding. Deputy Donohoo executed a traffic stop; when she approached Heflin’s vehicle, she smelled the odor of alcohol emanating from the vehicle and she saw several beer cans on the front passenger-side floorboard of the vehicle. Deputy Donohoo also noticed that Heflin’s speech was “somewhat slurred” and that he was unsteady when walking. (R. 73.) After Heflin failed three field-sobriety tests, Deputy Donohoo arrested him for driving under the influence and transported him to the Montgomery County Sheriffs Office, where an Intoxilyzer 5000 test was administered. The results showed that Heflin had a blood-alcohol level of .14%.
On appeal, Heflin contends that the trial court erred in admitting into evidence the results of the Intoxilyzer 5000 test. He makes three arguments in this regard; we address each in turn.
First, Heflin contends that the In-toxilyzer 5000 results were inadmissible because, he says, there was no evidence establishing the admissibility of those results pursuant to Frye v. United States, 293 F. 1013 (D.C.Cir.1923). We disagree.
In Seewar v. Town of Summerdale, 601 So.2d 198 (Ala.Crim.App.1992), this Court addressed an identical issue and stated:
“ ‘Tests conducted to determine the alcohol ... content in a ... breath sample have been recognized as having attained sufficient scientific acceptance to satisfy the ... Frye test.’ [C. Gamble,] McElroy’s [Alabama Evidence ] § 490.01(2) [ (4th ed.1991) ] (footnote omitted). See also § 32-5A-194, Code of Alabama 1975. See, e.g., Mayes v. City of Irondale, 577 So.2d 556 (Ala.Cr.App.1990); Stubstad v. City of Orange Beach, 575 So.2d 1240 (Ala.Cr.App.1991); Vizzina v. City of Birmingham, 533 So.2d 652 (Ala.Cr.App.1987), aff'd, 533 So.2d 658 (Ala.1988).
“Because the Intoxilyzer 5000 has been generally accepted as a valid test under § 32-5A-19I and the cases cited above, no Frye predicate is required for the admissibility of its results.”
601 So.2d at 200 (emphasis added). Contrary to Heflin’s contention, the State was not required to lay a Frye predicate for admission of the Intoxilyzer 5000 results.
Second, Heflin contends that the Intoxilyzer 5000 results were inadmissible because, he says, the State did not introduce into evidence the inspection logbook that is kept for each device. Contrary to Heflin’s contention, the logbook does not have to be introduced into evidence in order to admit the results of the Intoxilyzer 5000 test. In Steiner v. State, 706 So.2d 1308 (Ala.Crim.App.1997), this Court recognized that the results of an Intoxilyzer 5000 test may be admitted into evidence only if a proper predicate is laid either under Ex parte Mayo, 652 So.2d 201 (Ala.1994), or under § 32-5A-194(a)(l), Ala. *156 Code 1975.[1] We noted:
“Under either method of establishing the predicate for the introduction of test results, the State is required to show that the device was in proper working condition when the test was administered. This showing can be made in one of two ways. The officer who performed the inspection of the device can give direct testimony that it was in proper working condition, or the State may introduce a certified copy of the inspection logbook that reflects that the device passed inspection before and after the test was administered. See Gwarjanski v. State, 700 So.2d 357 (Ala.Cr.App.1996).”
706 So.2d at 1310 (emphasis added). Here, State Trooper Robert Lee Dettmar, who was a member of the implied-consent unit of the Department of Public Safety in October 1997 when Heflin was arrested, testified that he inspected the Intoxilyzer 5000 device that was used to test Heflin both before and after Heflin’s blood-alcohol test and that the device was working properly. In addition, the inspection sheets Trooper Dettmar filled out regarding those inspections were introduced into evidence; those sheets reveal that the device was in proper working condition when it was inspected. Therefore, the logbook did not have to be introduced into evidence.
Finally, Heflin contends that the results of the Intoxilyzer 5000 test were inadmissible because, he says, the Department of Forensic Sciences has a policy of not recording any malfunctions or problems with the Intoxilyzer 5000 device in the inspection logbook in order to “wilfully circumvent [the] credibility of the program.” (Heflin’s brief at p. 9) (emphasis in original).
At a pretrial suppression hearing, Trooper Dettmar testified that his responsibilities with the implied-consent unit included performing monthly calibration checks on Intoxilyzer 5000 machines in Montgomery County and also responding to calls regarding malfunctions and problems with Intoxilyzer 5000 machines. Trooper Dettmar testified that when he was assigned to the implied-consent unit he was taught, and he taught others (including members of the Montgomery County Sheriffs Department), not to record any malfunctions or problems with the Intoxilyzer 5000 devices in the inspection logbooks. During Trooper Dettmar’s testimony at the suppression hearing, Heflin introduced into evidence a handwritten note that Trooper Dettmar had placed on one of the Intoxilyzer 5000 machines in Elmore County. That note read:
“Please do not log any malfunction, errors, or problems with the instrument in the log book. (Ex.- — ‘out of order.’) This could cause other officers to lose cases in court, if the logbook is presented. Any problems with the instrument should be brought to my attention by phone or by leaving a note by the instrument.”
(C. 80.) Trooper Dettmar testified that although he did not place a similar note on the Intoxilyzer 5000 machine used in this case, the note reflected the standard practice and procedure in Montgomery County.
Trooper Dettmar further testified that if any device malfunctioned, the proper procedure was either to leave a note near the device or to telephone him. He stated that he kept no records of the telephone calls he received regarding malfunctions and that he did not keep any of the notes left on the machines. Trooper Dettmar stated that when he was informed of a *157 malfunction on an Intoxilyzer 5000 device, either through a note or a telephone call, he would inspect the device as soon as possible and recalibrate it if necessary. According to Trooper Dettmar, if there was a malfunction or problem with the device, the device would “lock up” so that no tests could be run until he arrived and recalibrated the machine. (R. 37.) Each time he calibrated a device (whether it was because a malfunction had been reported or as part of his monthly inspections), Trooper Dettmar said, he filled out an inspection sheet, which, although not part of the logbook, was also kept with the Intoxilyzer 5000 device.[2] Trooper Dett-mar stated that if he was specifically asked to inspect a device outside of his normal monthly check and he was aware of why he had been asked to inspect the device, such as a specific malfunction or problem, he would note that on the inspection sheet. The inspection sheets relating to the In-toxilyzer 5000 machine used in this case were introduced into evidence at the suppression hearing and, as noted above, at trial. The sheets, one dated October 27, 1997, and one dated November 21, 1997, contained two columns, one for the testing that occurred when Trooper Dettmar first arrived for the check and one for the testing that occurred when Trooper Dett-mar departed after calibrating the machine. In each column, Trooper Dettmar indicated whether the device passed or failed the numerous calibration tests that he performed. Trooper Dettmar testified that if the device failed one or more of the tests performed upon his arrival, he would attempt to repair the device. If he was successful, he would note that the device had passed all of the tests in the departure column, and he would write in the logbook that the device had been inspected and was working properly. If he was unsuccessful, Trooper Dettmar said, he would write that in the departure column of the inspection sheet and he would pull the device out of service and replace it with another device if another device was available. However, he would not write in the logbook that the device had malfunctioned and been pulled out of service. Essentially, Trooper Dettmar said, only those devices that were in good working condition were allowed to be used. The inspection sheets in this case showed that the machine used to test Heflin passed all but one of the calibration tests in both October and November. In October, the machine failed the “time check” test on arrival and Trooper Dettmar reset the clock on the machine to reflect daylight savings time — the machine passed the “time check” test on Trooper Dettmar’s departure. In November, the machine failed the “standard operational test” upon Trooper Dettmar’s arrival and the sheet indicates that Trooper Dettmar cleaned the printer on the machine — the machine passed the “standard operational test” on Trooper Dettmar’s departure.
Heflin argues that the practice of not recording any malfunctions or problems with the Intoxilyzer 5000 machines in the logbooks rendered it impossible for the State to establish that the machine used in his case was “operating properly on any given day” and, therefore, that the results of the Intoxilyzer 5000 test were not admissible. The State argues that the results were properly admitted and that the practice of not recording malfunctions or problems in the logbooks is necessary and justified. Specifically, the State argues that training the people who operate the *158 Intoxilyzer 5000 machines not to log any malfunction in the logbooks is necessary because the operators of the machines “are not trained to diagnose malfunctions and because they commonly mistake failures to produce the results they expect and their own errors for malfunctions of the instrument” and because training operators to enter a problem in the logbook, rather than reporting it to the implied-consent unit, would result in delays and problems in diagnosing and correcting any problems with the machines because an inspector may not be made aware of any problem until he or she arrives to perform monthly calibration checks and, by that time, “it is often impossible to discover who made the logbook entry or what occasioned it.” (State’s brief at p. 12.) The State further argues that although defense attorneys “would want logbooks to reflect erroneous and confusing entries by unidentifiable persons[,] ... [s]uch would do much to undermine the effect of properly administered chemical tests for intoxication.” (State’s brief at p. 18.)
We agree with the State that there are probably many good reasons for not recording malfunctions or problems with In-toxilyzer 5000 machines in the logbooks, including the confusion that may result from unidentified entries relating to unidentified problems. However, the issue before this Court is not whether there is a good reason for the practice — the issue is whether the practice affects the admissibility of the results of Intoxilyzer 5000 tests. We hold that it does not.
The practice of not recording malfunctions or problems in the logbooks, but of maintaining separate records for malfunctions, does not render the results from Intoxilyzer 5000 tests inadmissible. Rather, as Heflin essentially concedes in his argument, that practice affects only the weight and credibility of the test results. See, e.g., Faust v. City of Gadsden, 639 So.2d 536, 538 (Ala.Crim.App.1993) (holding that the fact the appellant’s breath sample was deficient did not affect the admissibility of the test results but affected only the weight to be accorded those results); and Harris v. State, 601 So.2d 1099 (Ala.Crim.App.1991) (same), overruled on other grounds, Ex parte Mayo, 652 So.2d 201 (Ala.1994). The history of malfunctions of any given Intoxilyzer 5000 machine is recorded on the inspection sheets; those sheets are kept with the machine and are available through discovery; and defendants are free to present evidence of malfunctions on a machine to the jury and to argue to the jury that it should give little or no weight to the Intox-ilyzer 5000 results because of the history of malfunctions on a particular machine. However, as long as the State lays the proper predicate either under § 32-5A-194(a)(1) or under Ex parte Mayo, 652 So.2d 201 (Ala.1994), the results of Intoxilyzer 5000 tests are admissible.
In this case, Heflin’s counsel cross-examined Trooper Dettmar extensively about the practice of not recording in the logbook any malfunctions or problems with the Intoxilyzer 5000 devices; about Trooper Dettmar’s specific instructions to local police not to record any malfunctions or problems with the device that was used on Heflin in the logbook, but to notify him instead; and about Trooper Dettmar’s practice of not maintaining records of the telephone calls he received regarding malfunctions. As noted above, the inspection sheets Trooper Dettmar filled out when he inspected the device used on Heflin were admitted into evidence. These sheets reflect that the device passed inspection both before and after Heflin’s blood-alcohol test. In addition, Trooper Dettmar testified that he could not remember ever being notified of a malfunction on the device used on *159 Heflin, but that it was possible that he had been. The weight to be accorded Heflin’s tests results was a question for the jury, not for the court. Therefore, the trial court did not err in admitting into evidence the Intoxilyzer 5000 test results.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
McMILLAN, P.J., and COBB, BASCHAB, and WISE, JJ., concur.

. Heflin does not argue that the State failed to lay one of these predicates.

. These sheets must be filled out pursuant to a rule established by the Alabama Department of Forensic Sciences. See Ala. Admin. Code, Rule 370-1-1 (Department of Forensic Sciences).