JOHNSTONE, Justice
(concurring specially).
My reason for concurring in the decision of this Court to quash the writ of certiorari we have previously issued in this case is that, in my opinion, the defendant James Duke Heflin did not preserve before the trial court the dispositive ground that oth-. erwise would require a reversal of the defendant’s conviction. Other reasons for quashing are that the petition does not comply with Rule 39(d)(3), Ala. R.App. P., and the substance of the accompanying brief does not comply sufficiently with Rule 39(f)(1) and Rule 28(a)(10), Ala. RApp. P. My review of the record while this Court has had it, however, prompts some observations.
The Intoxilyzer 5000 test was administered to the defendant on October 30, 1997. Trooper Robert Lee Dettmar was the only witness qualified to testify whether the Intoxilyzer 5000 “device was in proper working condition when the test was administered” as required by Steiner v. State, 706 So.2d 1308, 1310 (Ala.Crim.App.1997). Trooper Dettmar testified that he conducted monthly inspections on I-5000 devices in Alabama and responded to service calls about malfunctions or errors in those devices. He stated that each time he performed an inspection on a device he filled out an inspection form called an IC-12 form. He identified only two IC-12 *160 forms that he had filled out for his inspections of the device used to test Heflin. One IC-12 form was dated October 27, 1997, three days before Heflin’s October 30, 1997 test, and the other form was dated November 21, 1997, 22 days after Heflin’s test. The October 27 inspection form showed that the device had initially failed the “time check” test, and that, after Trooper Dettmar reset the time back one hour, the device had passed that test as well as others. The November 21 inspection form showed that the device had initially failed the “standard operational test,” and that, after Trooper Dettmar cleaned the printer, the device had passed that test as well as others. In other words, while the device was in proper working condition as Trooper Dettmar last left it before the defendant’s test, the device was not in proper working condition as Trooper Dettmar first found it after the defendant’s test. No personal observation by Trooper Dettmar and no documentation on the device supplied any basis for Trooper Dettmar or any fact-finder to conclude that the malfunctioning condition of the device revealed by the November 21 inspection had not commenced before the defendant’s October 30 test although after the October 27 inspection. Therefore, a timely objection to this effect would have required the trial court to exclude Trooper Dettmar’s conclusory answer that the device was in proper working condition when the defendant’s test was administered and likewise would have required the trial court to exclude the results of the test itself. The defendant, however, did not object on this particular ground.
The opinion of the Court of Criminal Appeals in this case, Heflin v. State, 857 So.2d 154 (Ala.Crim.App.2002), reveals that the policies and procedures of the Department of Public Safety (D.P.S.) and the Department of Forensic Sciences (D.F.S.) have eliminated any probative value from the logbooks kept on these devices on the issue of whether one was in proper working condition before an inspection or a service call:
“Trooper Dettmar testified that, if the device failed one or more of the tests performed upon his arrival, he would attempt to repair the device. If he was successful, he would note that the device had passed all of the tests in the departure column, and he would write in the logbook that the device had been inspected and was working properly.”
Heflin, 857 So.2d at 157 (emphasis added). Such a logbook would indicate facially that a device which was inspected or serviced on dates before and after a test was administered to a suspect was in proper working condition both before and after the test was administered to the suspect even in a case, like the one now before us, wherein the device was not in proper working condition at the beginning of the inspection following the date the test was administered to the suspect.
In the case now before us, the State relied, not on the logbook, which was lost before trial, but on Trooper Dettmar’s testimony based on the IC-12 inspection forms to establish the predicate for the admissibility of the result of the test administered to the defendant. This Court has not yet reviewed a properly preserved and briefed claim that a trial court erred by admitting test results which depend on a predicate consisting of a logbook kept as Trooper Dettmar’s testimony reveals the D.P.S. and the D.F.S. were requiring at the time of the case now before us, a logbook intentionally kept so as to omit references to the failures of the device to pass inspection tests of its functioning. Hopefully trial courts will recognize the fallacy of such a predicate.
*161 The current limited role of logbooks is noteworthy. On the one hand, the Court of Criminal Appeals has held in a number of cases that logbooks are admissible pursuant to the business records exception to the hearsay rule. Gwarjanski v. State, 700 So.2d 357, 359 (Ala.Crim.App.1996). That court as well as the trial courts apparently assumed that, if a device failed a test of functioning upon inspection, that failure would be noted in the logbook. See id. If that assumption was ever accurate, it is not accurate now.
On the other hand, logbooks are not the records the D.F.S. uses to monitor the working condition of these devices. No statute, rule, regulation, or caselaw requires logbooks to be maintained at all. Rather, Rule 370-1-1-.02 of the Rules of the Alabama Department of Forensic Sciences, Chemical Test for Intoxication, promulgates the IC-12 inspection form as the record the D.F.S. uses to monitor the working condition of these devices. This form requires the inspector to enter a “pass” or “fail” for each of the different inspection tests of the functioning of the device conducted in two separate series at, respectively, two distinct stages of the inspection: first, when the inspector “arrive[s],” before he or she performs any maintenance or repair; and, second, when the inspector “depart[s],” after he or she has performed any maintenance or repair. Rule 370-1-1-.02 and the IC-12 form. Thus, an IC-12 form, if the “arrive” series of inspection tests have been properly conducted, and if the “pass” or “fail” results for the “arrive” series of inspection tests have been accurately entered, would tend to prove whether or not the device was in proper working condition as it existed before any maintenance or repairs were performed during the particular inspection visit.
Rule 370-1-1-.02 requires that a copy of each IC-12 form completed for a device be “file[d]” “with the logbook.” Two more copies are maintained at, respectively, the D.P.S. and the D.F.S., according to the D.F.S. amicus curiae brief filed with us in this case. The D.F.S. has promulgated Rule 370-1-1-.02 and form IC-12 pursuant to the authority granted by § 32-5A-194(a)(1), Ala.Code 1975, and pursuant to the recommendation in Ex parte Mayo, 652 So.2d 201, 209 (Ala.1994).